# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CARLOS A. GREENE, | * | |
| Plaintiff | * | |
| v | * | Civil Action No. RDB-17-1162 |
| WEXFORD HEALTH SOURCES, INC., DEPARTMENT OF CORRECTIONS, KIMBERLY R. MALIN, R.N. JASON CLEM, M.D. FLORENCE D. ENOCH, R.N. DR. MATERA, WARDEN FOXWELL, SGT. MURI,[1] EXECUTIVE DIRECTOR RUSSELL A. NEVERDON, | * * * * | |
| Defendants | * | |

\*\*\*

## MEMORANDUM OPINION

In response to Carlos A. Greene's civil rights complaint, Defendants the Department of Corrections, Warden Foxwell, and Executive Director Russell A. Neverdon (collectively the "State Defendants") filed a Motion to Dismiss or in the Alternative for Summary Judgment. (ECF 13). Defendants Wexford Health Sources, Inc. ("Wexford"), Kimberly R. Malin, R.N., Jason Clem, M.D., Florence D. Enoch, R.N., Paul Matera, M.D., and Ruth Pinkney, P.A. (collectively, the "Medical Defendants") also filed a Motion to Dismiss or in the Alternative for Summary Judgment. (ECF 20). Defendants' dispositive motions are unopposed.[2]

This Court finds no need for a hearing. *See* Local Rule 105.6 (D. Md. 2016). For

---

[1] Service was not obtained on Sergeant Muri. Had service been effectuated on him, he would be dismissed from this matter for reasons discussed herein.

[2] Consonant with *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the Clerk sent notices to Greene informing him that he may file a response with affidavits and exhibits in support. (ECF 14, 21). This Court also granted his request for an extension of time to file a reply. (ECF 23, 24).

reasons to follow, Defendants' Motions (ECF 13, 20) ARE GRANTED.

## BACKGROUND

Self-represented plaintiff Carlos Greene is incarcerated at Eastern Correctional Institution ("ECI") in Westover, Maryland. On April 27, 2017, Greene filed this lawsuit pursuant to 42 U.S.C. §1983, alleging that Defendants acted with deliberate indifference to his medical needs by failing to provide him pain medication and administer his eye drops after he had ophthalmic surgery for glaucoma.[3] Greene seeks compensatory and punitive damages from Wexford and the Department of Corrections and asks for unspecified sanctions against the individual Medical Defendants (ECF 1, 9).

Greene underwent surgery for glaucoma at Johns Hopkins' Hospital's Wilmer Eye Institute ("Hopkins") on October 28, 2016. Greene was discharged the same day and admitted to the infirmary at Jessup Correctional Institution for observation and treatment. Greene returned to his housing unit at ECI on November 4, 2016.

Greene claims that he was not seen by a medical provider until November 9, 2016 when he informed Ruth Pinkney, PA that he was in pain and needed assistance taking his eye drops. (ECF 9 at 1-2). Greene explains that he needed help with his eye drops because he cannot see or feel. (ECF 1 at 2). Greene's cell mate was helping him take the eye drops, but no longer wanted to assist him. *Id.*

On November 11, 2016, Greene informed Sheila Kerpelman, N.P. that he was in pain and missing doses of his eye drops due to inconsistent administration by his cell mate. Greene was readmitted to the ECI infirmary. On November 14, 2016, Jason Clem, M.D. discharged Greene from the infirmary to his housing unit. According to Greene, Clem discharged him because the

---

[3] Glaucoma is a group of diseases that can damage the optic nerve of the eye. It is a leading cause of blindness. It usually happens when the fluid pressure inside the eye increases to damage the optic nerve. *See* https://medlineplus.gov/glaucoma.html (last visited December 28, 2017).

bed space was needed for others, "receiving eye drops wasn't serious enough" and Greene's cell mate could assist him. (ECF 1 at 2; ECF 9 at 2). Greene maintains he was denied assistance with his medication from November 14, 2016 until November 23, 2016. Greene asserts that Clem "kicked" him out of the infirmary on November 14, 2016 and discontinued his pain medication from November 28, 2016 to December 13, 2016. (ECF 9 at 4). Greene claims his pain medication was discontinued on November 28, 2016, which caused him to suffer pain until December 24, 2016. He claims that on January 6, 2017, medical staff stopped assisting Greene with his eye drops. (ECF 1, 9).

Greene told his physician at Hopkins, Dr. Thomas Vincent Johnson, III, that he was not receiving his prescribed eye drops. (ECF 20-3) Johnson said he would write a note to ECI medical providers that Greene needed to take Prednisolone drops as prescribed.

On December 2, and December 12, 2016,[4] Greene informed Sarah Johnson, R.N. and Bruce Ford, P.A., respectively, about his need for eye drops and his pain concerns. (ECF 20-3 at 101, 103). Johnson and Ford advised they would contact Clem to renew Greene's medications. Greene faults Clem for failing to renew his pain medication or eye drops. Greene also complains he was never scheduled for a recommended post-operative follow-up. (ECF 9 at 3, 20-3 at 16). Further, Greene claims that on January 6, 2017, Clem and Kimberly Malin, R.N. refused him medical care and withheld his eye drops even after Greene requested them so that he could ask his cellmate for assistance. Notably, Greene raises no specific allegations against the State Defendants.

---

[4] The record shows Greene met with Ford on December 13, 2016. (ECF 20-3 at 103).

**STANDARD OF REVIEW**

I.   **MOTION TO DISMISS**

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). To satisfy Rule 8(a)(2), a complaint need not include "detailed factual allegations." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, a plaintiff must plead more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555. A complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if... [the] actual proof of those facts is improbable and ... recovery is very remote and unlikely." *Id*. at 556 (internal quotations omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc*., 637 F.3d 435, 440 (4th Cir. 2011); *see Hall v. DirectTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017). Further, a pro se plaintiff's pleadings are "to be liberally construed" and are "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see Alley v. Yadkin County Sheriff Dept*., No. 17-1249, 698 Fed .Appx. 141, 2017 WL 4415771 (4th Cir. Oct. 5, 2017). However, even a pro se litigant's complaint must be dismissed if it does

not allege a "plausible claim for relief." *Iqbal*, 556 U.S. at 679.

## II. SUMMARY JUDGMENT

Summary judgment is governed by Fed. R. Civ. P. 56(a) which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion, explaining that "[b]y its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.' " *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to ... the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526.

A court must liberally construe pleadings filed by pro se litigants to allow them to fully develop potentially meritorious cases. *See Erickson,* 551 U.S. at 94; *Cruz v. Beto*, 405 U.S. 319 (1972). However, a court cannot assume the existence of a genuine issue of material fact where none exists. Fed.R.Civ.P. 56(c).

**ANALYSIS**

To proceed under 42 U.S.C. § 1983, a plaintiff must allege a violation of a federal constitutional right or a right secured by federal law. *Baker v. McCollan*, 443 U.S. 137, 140 (1979). To state a claim under § 1983, a plaintiff must: 1) "allege the violation of a right secured by the Constitution and laws of the United States"; and 2) "show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

### I. STATE DEFENDANTS

The State Defendants move for dismissal of the claims against them, accurately noting that Plaintiff names them as Defendants, but fails to allege how they violated his constitutional rights or federal law. Because the Complaint makes no specific allegations against the Department of Correction, Warden Foxwell, and Executive Director Neverdon, the claims against them will be dismissed with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

The Court takes note that the Department of Correction, which is a unit of the Department of Public Safety and Correctional Services, is not a "person" amenable to suit under 42 U.S.C. § 1983 and is entitled to dismissal of the claims against it on this ground as well. *See Will v. Michigan Department of State Police*, 491 U.S. 58 (1989),. Further, for liability to exist in a §1983 case, the Defendants must have personally participated in the alleged violation or be culpable under principles of supervisory liability. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *Vinnege v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). Greene fails to allege that Defendants Foxwell and Neverdon were personally involved in his medical care after eye surgery or are otherwise culpable based on supervisory liability.

## II. MEDICAL DEFENDANTS

The Medical Defendants have filed declarations and verified exhibits, including Greene's medical records, with their dispositive motions. Greene does not dispute Defendants' records or declarations.

### A. MEDICAL DEFENDANTS' EXHIBITS

The Medical Defendants have filed Defendant Jason Clem's declaration and 173 pages of Greene's medical records. These exhibits demonstrate that on October 28, 2017, Greene underwent surgery at Hopkins on his right eye to treat glaucoma.[5] The ophthalmologist prescribed various eye drops including Pred Forte, 1 drop every 2 hours while awake, Timolol, 1 drop twice daily, Brimonidine 1 drop daily, Dorzolamide (or COSOPT) 1 drop daily, Latanoprost 1 drop daily, and Ciprofloxacin, 1 drop four times daily for one week.[6] Declaration of Jason Clem, M.D., (ECF 20-4; *see also* ECF 20 at 16).

Greene was subsequently provided post-operative care in the ECI infirmary. Greene's medical record dated October 30, 2016, indicates his eye drops were kept at his bedside for self-application with minimal assistance. (ECF 20-3 at 34). The record from October 31, 2016 notes that his eye drops were with him. *Id*. at 36.

On November 1, 2016, Melaku Ayalew, MD noted on the medical record that Greene was doing well. Ayalew continued Greene's medications for Brimadine, COSOPT, and

---

[5] Greene's glaucoma is attributed to trauma sustained to the right eye in an automobile accident in February of 2015. (ECF 20-3 at 5).

[6] Pred Forte is a brand name for ophthalmic prednisolone, a steroid that reduces irritation, redness, burning, and swelling of eye inflammation. It is sometimes used after eye surgery. Timolol is used to treat glaucoma, a condition in which increased pressure in the eye can lead to gradual loss of vision. Timolol works by decreasing the pressure in the eye. Brimonidine is used to lower pressure in the eyes in patients who have glaucoma and ocular hypertension (pressure in the eyes that is higher than normal but not high enough to cause vision loss). Ophthalmic Dorzolamide is used to treat glaucoma by decreasing ocular pressure. COSOPT is the brand name for a medication that combines Dorzolamide and Timolol treat eye conditions, including glaucoma and ocular hypertension. Latanoprost ophthalmic is used to treat glaucoma by lowering pressure in the eye by increasing the flow of natural eye fluids out of the eye. Ciprofloxacin ophthalmic solution is used to treat bacterial infections of the eye. *See* https://vsearch.nlm.nih.gov. (last visited December 28, 2017).

Latanoprost. Ayalew emphasized that Greene "must get his Prednisolone Acetate drops every two hours while awake." *Id*. at 41. Greene's eye drops were reordered and a one month follow up consultation at Hopkins wasscheduled. *Id.*; ECF 20-3 at 41-44.

On November 2, 2016, Greene went to his five day post-operative appointment at Hopkins. (ECF 20-4). The medical notes from that date show Greene reported to his Hopkins physician that he had not received his Pred Forte (prednisolone) eye drops until the previous day (ECF 20-3 at 51). Dr. Clem disputes this claim in his declaration. Clem attests that Greene's eye drops were regularly administered or he was assisted in self-administering the eye drops by medical staff as prescribed. Clem notes Hopkins providers found that Greene was doing well. (ECF 20-4 ¶6; *see also* ECF 20-3).

Greene's medical records from November 3, and 4, 2016 indicate "all eye drops given with assistance." (ECF No. 20-3 at 56, 61). On November 4, 2016, Greene was discharged from the ECI infirmary by Paul Matera, M.D. and returned to his housing unit. (ECF 20-4 ¶7; *see also* ECF 20-3 at 62). Dr. Clem states Greene was evaluated and cleared for discharge to the general prison population by a physician and there was no subsequent requirement for a reevaluation by a nurse. (ECF 20-4 ¶8).

Greene complained to Sheila Kerpelman on November 8, 2016 about his difficulty administering his eye drops due to blindness and inconsistent administration by his cellmate, prompting Greene's readmission into the infirmary. *Id; see also* ECF 20-3 at 63. He complained there was no decrease in pain since his surgery. Greene was instructed in the infirmary how to administer the drops as prescribed. From November 11-14, 2016, medical providers evaluated Greene's ability to self-administer eye drops. Clem states that Greene's admission to the infirmary was to be temporary, not permanent. (ECF 20-4 ¶8; ECF 20-3 at 67-92). The medical

record reflects Greene was recovering without incident, wore an eye patch and dark glasses, and received his eye drops either from medical providers or was assisted in self-administering them. Greene reported no distress, headaches, fever, or eye discharge. Further, Greene was observed to have spent at least most of one night in the infirmary reading, an indication that he possessed the necessary visual and motor skills to self-administer his eye drops. *Id*. ¶9. Greene was given Tramadol[7] for pain. (ECF 20-3 at 71).

On November 14, 2016, Dr. Clem met with Greene. Since his readmission, both Greene and nursing staff reported that his ability to self-administer the eye drops had improved. Clem personally instructed Greene how to take his eye drops. Clem evaluated Greene, determined he was able to self-administer his eye drops, and discharged him from the infirmary with orders for a follow up referral in 1-2 weeks and for a nursing check every day for four days to ensure proper administration of the eye drops. *Id*. ¶10. Greene was placed on bed rest and feed in cell status upon his return to the housing unit. *Id.*

On November 15, 2016, Melissa Richbark, R.N. met with Greene for complaints of difficulty giving himself his eye drops. Richbark watched Greene administer the drops, reporting that he poked his eye with the bottle and then refused to continue. Richbark instructed him to lie down, to place his finders in a ring around his eye, and to rest the bottle edge on the fingers so that it would not touch the eye. Richbark notified Dr. Clem about Greene's difficulty in self-administering the drops. Clem determined Richbark's follow up instruction combined with the education received in the infirmary, was sufficient to enable Greene to self-administer eye drops. *Id*. ¶11.

---

[7] Tramadol is used to relieve moderate to moderately severe pain. Tramadol is in a class of medications called opiate (narcotic) analgesics. It works by changing the way the brain and nervous system respond to pain.
See https://medlineplus.gov. (last visited December 28, 2017).

Clem disputes Greene's account of a follow-up visit to Hopkins on November 23, 2016.[8] Clem disputes Greene's assertion that he did not receive eye drops at ECI. *Id*. ¶12. Greene returned with his medications to ECI, where they were administered to him. When Greene returned to his housing unit, his medications were sent the next morning to the housing unit. Greene's prescriptions for Pred Forte and Brimonidine were renewed.

On November 29, 2016, Greene filed a sick call slip that he was not receiving his medication. When Greene was seen by medical providers the next day, he refused to take his eye drops. *Id*. ¶13.

Thereafter Greene complained on several occasions that he was unable to take his ophthalmic drops by himself and he did not have his eye drops. The record shows that on December 2, 2016 and December 18, 2016, medical staff administered the eye drops to Greene. Clem attests Greene's eye drops were renewed regularly and always available, except when Greene refused them. *Id*. ¶14.

On December 16, 2016, Greene submitted a sick call slip which stated "I am still not getting my medication 'Ultram' after speaking to PA Bruce or all the eye drops needed which is why I've been in pain.[9] (ECF 20-3 at 108). The medical record shows Ford submitted a request to reorder Greene's medications, including Tramadol and eye drops on December 13, 2016. *Id.* at 106-107. As of December 18, 2017, the medication had not arrived from the pharmacy. *Id.* at 109.

On December 21, 2016, Greene told nurse Becky L. Harley that he can "not feel with my eye still," he had received his pain medication the previous night, and the pain medication was

---

[8] Clem indicates the medical records from this visit are not available, although he does not explain why. (ECF 20-4 ¶12).
[9] Ultram is a brand name for Tramadol. *See* https://medlineplus.gov. (last visited December 28, 2017); *see also infra* n. 4.

"not working." *Id*. at 110. Harley reported Greene's eye was red with a discharge on the inner corner of his eye. *Id.* Greene was referred to a provider at the chronic care clinic.

On December 22, 2016, Deborah Tabulov, N.P saw Greene at the Chronic Care Clinic. Greene indicated that his vision was better before the glaucoma surgery. His eye medications were renewed. (ECF 20-3 at 112-115).

On January 12, 2017, Melissa Richbark, R.N. saw Greene for complaints of pain on the right side of his face. Greene also complained of difficulty using eye drops and asserted that he had not been taught how to self-administer them. Greene admitted to Richbark that she had taught him previously how to use eye drops. He complained staff would not give him eye drops because they did not know where they were. Greene was offered and refused eye drops to take back to his cell. (ECF 20-3 at 116; ECF 20-4 ¶ 15).[10]

Medical records from Greene's follow-up visit at Hopkins with Thomas Vincent Johnson, M.D. on January 26, 2017, indicate that Greene's was responding well to the surgery. (ECF 20-4

---

[10] Greene filed an Administrative Remedy Request ("ARP") about his medical concerns. The ARP was dismissed after investigation based in part on the following findings:

> On 1/6/17, you were brought to medical to receive eye drops. You were re-educated on self-administering eye drops. Medical Director was present during education and training. You began to argue with the doctor, requested you were offered your eye drops and declined to take them. On 1/26/17, you were seen for a post op. An assessment was performed and new orders were written. Your eye drops are no longer every 2 hours. You were cleared to return to the housing unit without restrictions. An interview was also done with Nurse Kim. Nurse Kim states, you were called up to medical for re-education on self- administering your eye drops. When you arrived you immediately stated you were not going to administer yourself and that medical had to do his drops for him every two hours. Nurse Kim stated you were educated that you were released from the infirmary with your eye drops as self-administered and that you were provided an eye donut to assist when needed. Nurse Kim states that you began to argue. At that time, you requested the chronic care nurse, Director of Nursing, and Medical Director to be present while she re-educated you again. At that to leave and refused to take your eye drops with you. You refused to sign ROR. On 1/12/17, you were seen by nursing with complaints of pain and complaints of difficulty administering eye drops. At that point, per Nurse Kim, you became loud and yelling at the Medical Director. Custody intervened and you were asked to leave the area. Per Nurse Kim, at no time did she raise her voice. Nurse Kim states she was trying to show you how to administer the eye drops.

(ECF 13-2 at 45).

¶16; ECF 20-3 at 118-119). The tube inserted during surgery looked "excellent." *Id.* Greene's retina looked good. His intraocular pressure was high. Greene's right eye vision was "hand motion," the left eye was 20/30 corrected to 20/25. *Id.* Greene told Dr. Johnson that he had not been receiving any of the prescribed eye drops for two months. Clem avers this "led the Johns Hopkins providers to question whether he [Greene] had been getting his medications appropriately" (ECF 20-4 ¶16; *see also* ECF 20-3 at 120), because Johnson wrote on Greene's medical chart "patient reports continued right side face, head, and ear pain. No eye pain, but the eye does feel dry. He has been completely off eye drops since December." (ECF 20-3 at 120). Dr. Johnson also noted Greene's eyelid was "malpositioned," likely related to a dry eye, and referred Greene was referred to the General Eye Surgery clinic to assess the possibility of plastic surgery. Johnson prescribed Latanoprost 1 drop nightly and COSOPT 1 drop twice daily and recommended he return for a three-month follow-up visit. (ECF 20-4 ¶16; ECF 20-3 at 122).

On January 27, 2017, Greene returned to ECI and to his housing unit. He complained he was unable to give himself his eye drops. His eye drops were given to the dispensary nurse. *Id*. ¶ 17; ECF 20-3 at 126.

On February 7, 2017, Greene told Sheila Kerpelman, N.P. that he was blind and unable to place his eye drops. Greene was assessed as needing intervention by behavioral health providers because he had been taught repeatedly to self-administer eye drops by medical staff, and assessed to have the necessary motor and visual skills. Further, Greene was observed successfully giving himself eye drops. Kerpelman discussed Greene's situation with Dr. Clem, since Greene was likely to need eye drops over a long period of time. Kerpelman also discussed the addiction risks of long-term Tramadol treatment with Greene and explained a plan to switch him to Tylenol or nonsteroidal anti-inflammatory drugs (NSAIDS) at his next chronic care clinic

visit in three months. (ECF 20-4 ¶18; ECF 20-3 at 128-129). Clem states Greene's repeated denial of the ability to self-administer and availability of his eye drops suggested a nonmedical impairment which might respond to behavioral health treatment.[11]

On March 23, 2017, Greene was seen at Hopkins General Eye Service for a right lower eyelid ectropion[12] with symptoms of dryness and irritation. The Hopkins physician determined a lower lid ectropion repair with laser tissue soldering and skin graft, would not improve the tearing, but would improve dryness and irritation. COSOPT 1 drop twice daily and Xalatan[13] one drop nightly were recommended. *Id.* ¶ 19; ECF 20-3 at 145.

On April 4, 2017, JoVonee Osborne, CRNP examined Greene at ECI. Greene complained he was unable to self-administer his eye drops and nursing staff refused to assist him. He claimed he had not had his eye drops in four months. The charge nurse told Osborne that Greene had been self-administering eye drops, refused further training, and his medications were KOP (keep on person). Greene self-administered his eye drops with minimal assistance, but was unable to see or feel if they were in correctly. Osborne instructed Greene to go to the infirmary twice daily for eye drops, and nursing staff would observe and assist him if necessary. (ECF 20-3 at 157).

Osborne met with Greene again on April 17, 2017. The nurse who had been monitoring Greene put the drops in his eyes, reported he was capable, but not confident, and additional monitoring was needed. Greene stated Dorzolamide caused a burning sensation in his eye and was drying. He reported that he had not been using artificial tears. He was instructed to comply with directions for using artificial tears and return in one to two weeks. Greene was informed

---

[11] The record does not indicate whether behavioral health treatment was provided.

[12] This describes an eyelid that turns outward (ectropion). *See* https://medlineplus.gov. (last visited December 28, 2017).

[13] Xalatan is a brand name for Latanoprost. *See infra* n. 3.

13

that he had been scheduled for surgery for his eyelid. *Id.* ¶ 23.

On May 2, 2017, Paul Matera M.D. saw Greene for eye irritation caused by his eye drops, but continued to use them. Dr. Matera ordered another eye patch for him. (ECF 20-3 at 161).

On May 5, 2017, Greene told Ruth Pinkney, PA that he could not feel whether his eye drops were being correctly placed. Pinkney noted Greene was being monitored twice daily for eye drop administration. Greene complained the eye drops burned, but he would continue them until his next follow-up appointment. Green complained of facial pain and asked to increase his pain medication. (ECF 20-4 ¶ 25).

On May 10, 2017, Greene went to Hopkins for a follow-up appointment.[14] He reported he had a dry right eye and again told Hopkins providers that he was not using drops. The report of that visit shows his intraocular pressure ("IOP") was excellent. His right eye vision was hand motion, the left eye was 20/20. Greene's COSOPT was changed to preservative free COSOPT to alleviate burning sensations with use. Greene was told to return in four months. *Id.* ¶ 26.

Greene's prescription for Ultram on an as needed basis was discontinued on November 30, 2016. On December 2, 2016, Greene complained about pain. Dr. Clem was notified. Clem attests that because he is the medical director he is required to approve non-formulary medications, so he cannot submit and approve a non-formulary medication request. Another provider must submit the nonformulary medication request. (ECF 20-4 ¶ 26). Clem states it is unclear why Greene's prescription was not re-submitted by another provider. The prescription was renewed on December 13, 2016. Clem indicates that the medication was not intended for long-term use for Greene's condition and a prescription on an as needed basis implies that it is

---

[14] The medical note indicates Greene was scheduled for an ectropion repair on July 5, 2016. (ECF 20-3 at 168).

not needed regularly. Although Greene submitted a sick call slip on November 29, 2016, complaining that he was not receiving eye drops or any other medication, it was not until December 16, 2017, that he filed a sick call slip requesting renewal of his Ultram prescription. *Id.*

### B. CLAIMS AGAINST WEXFORD

Wexford Health Sources, Inc. is not an appropriate party in this action because the doctrine of respondeat superior does not apply to § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Md. Dep't of Pub. Safety & Corr. Servs.,* 316 Fed.Appx. 279, 282 (4th Cir. 2009). To the extent that Greene seeks to hold Wexford liable based on supervisor liability, he fails to identify in his pleadings a Wexford policy or procedure that proximately caused a violation of his rights. *See Monnell v. N.Y. City Dep't of Social Servs.,* 436 U.S. 658, 690 (1978). Therefore, the claims against Wexford will be dismissed. *See Love-Lane*, 355 F.3d at 782.

### C. EIGHTH AMENDMENT CLAIM

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone,* 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth

Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it...[T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences...To lower this threshold would thrust federal courts into the daily practices of local police departments." *Grayson v. Peed*, 195 F.3d 692, 695–96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the plaintiff was suffering from a serious medical need and that the prison staff was subjectively aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A serious medical condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008), *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce,* 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter...becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.' "

*Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844.

The treatment must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Jackson v. Sampson*, 536 Fed. Appx. 356, 357 (4th Cir. July 30, 2013); *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. 825, 837 (1994) (citation omitted). Further, "any negligence or malpractice on the part of ... doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir.1998). Disagreements between medical staff and an inmate as to the necessity for, or the manner or extent of, medical treatment do not rise to a constitutional injury. *See Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

The Medical Defendants do not dispute Greene's need for prescribed eye drops and pain medication constitute a serious medical need and that medical staff were aware of his needs. Defendants unopposed verified records and Dr. Clem's declaration demonstrate that Greene received ongoing instruction and assistance in taking his eye drop medications. Green was twice admitted to the ECI infirmary for observation, education, and administration of the eye drops. After reviewing the record and personally instructing Greene how to put drops in his eyes, as well as observing him, Dr. Clem determined Greene had no physical or medical impediment to self-administration. Even after so concluding, medical staff continued to assist and educate Greene in response to his concerns. Greene's disagreement with medical providers concerning

his ability to self-administer his eye drops will not support an Eighth Amendment claim.

Further, Dr. Clem dispels Greene's claim he received no medication from November 28, 2016 to December 13, 2016. Clem explains that if he was notified of the request to renew Ultram, he was unable to renew the prescription and also approve the non-formulary request, it is unclear why another provider did not renew the order instead, and Greene did not submit a sick call slip in this regard until December 15, 2016. While this episode may suggest negligence or a lack of coordination, there is no evidence Clem or any other Medical Defendant acted with requisite subjective recklessness to predicate a constitutional claim. "[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and want infliction of pain' or to be repugnant to the conscience of mankind.'" *Estelle*, 429 U.S. at 105-106.

Viewed in the light most favorable to Greene, the record presents no genuine issue of material fact to support his claim of deliberate indifference against the Medical Defendants. Accordingly, summary judgment will be entered in their favor.

## CONCLUSION

For these reasons, the State Defendants' and the Medical Defendants' Motions to Dismiss or, in the Alternative, for Summary Judgment ARE GRANTED. A separate Order will be entered.

January 3, 2018.  _____/s/_____
RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE